FILED
Aug 04, 2025
07:47 AM(CT)
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT MURFREESBORO

| | |
|---|---|
| **MICHAEL BROWN,** | **)**   **Docket No. 2024-50-2857** |
| **Employee,** | **)** |
| **v.** | **)**   **State File No. 8952-2023** |
| **CITY OF PULASKI ELECTRIC** | **)** |
| **SYSTEMS,** | **)**   **Judge Robert Durham** |
| **Self-Insured Employer.** | **)** |

---

## EXPEDITED HEARING ORDER GRANTING BENEFITS
### *(DECISION ON THE RECORD)*

---

Mr. Brown asked that Pulaski authorize the cervical disc fusion surgery recommended by Dr. Erion Qamirani and pay additional temporary disability benefits. Pulaski denied the surgery based on lack of medical necessity. For the following reasons, the Court orders Pulaski to authorize the surgery and pay additional temporary disability benefits.

## History of Claim

Mr. Brown suffered a work injury on February 1, 2023, when a bucket from a boom truck struck him on the head as it was lowered to the ground. He immediately went to the emergency room, where he reported neck, back, and right-shoulder pain but no weakness or numbness. Multiple CT scans did not reveal any acute abnormalities.

When Mr. Brown's pain did not improve with conservative treatment, Pulaski authorized him to see board-certified orthopedic spine specialist Dr. Qamirani. At his first visit in March, Mr. Brown complained of "9 out of 10 level" stabbing pain on the right side of his neck that radiated to the top of both shoulders and down the thoracic spine as well as occasional numbness in his right shoulder and hand.

Dr. Qamirani diagnosed a cervical sprain and ordered a cervical MRI, which occurred in April. According to the radiologist, the MRI revealed "overall mild degenerative changes resulting in mild bilateral foraminal stenosis C3-C4. No central

1

protruded disc or central canal stenosis." However, Dr. Qamirani disagreed with this interpretation. He described the MRI as revealing a "C3-4 bulging disc with severe right and moderate left foraminal stenosis."

Dr. Qamirani treated Mr. Brown with steroid injections, but he still experienced "8 out of 10" pain in his neck and shoulders with occasional numbness in his right upper extremity. He also complained of frequent migraines. Dr. Qamirani ordered additional physical therapy but noted that a cervical fusion might be necessary if Mr. Brown did not significantly improve.

Mr. Brown still had not improved by his next visit in August. In addition to his other complaints, he reported numbness in his left arm and fingers. Based on the lack of improvement and the severity of symptoms, Dr. Qamirani recommended a C3-C4 disc fusion. He cautioned that he would discharge Mr. Brown from treatment if Pulaski denied the surgery.

Pulaski sent the surgery recommendation through utilization review to a board-certified orthopedist, Dr. Sean Lager. Dr. Lager said that Dr. Qamirani's MRI review was inconsistent with the radiologist's, and Mr. Brown's symptoms were not in line with objective tests. He also said that no neurological deficits were present at the C3-4 level. Dr. Lager further noted that Mr. Brown smoked, which led to unsuccessful fusions. Thus, he denied the surgery.

Mr. Brown appealed the decision to the Bureau's medical directors. Dr. Robert Snyder and Dr. James Talmage, both orthopedists, agreed with Dr. Lager. The denial letter said that the procedure was not medically necessary.

Dr. Qamirani discharged Mr. Brown, and Pulaski authorized Dr. Robert Clendenin, physical medicine and rehabilitation specialist, to see him in October. Mr. Brown told Dr. Clendenin that he suffered a new onset of pain in July or August, so that it now radiated into the left arm as well as the right. Dr. Clendenin ordered a second cervical MRI and bilateral upper extremity EMGs.

At the next visit, Dr. Clendenin noted the MRI revealed severe right foraminal stenosis and moderate to severe left stenosis due to spondylosis at C3-4 that impinged upon the exiting right nerve roots. The EMGs showed evidence of mild cubital tunnel syndrome on the right. However, Dr. Clendenin did not see any evidence of a disc herniation or acute radiculopathy. He said he could not verify any of Mr. Brown's pain complaints or see any abnormality he could attribute to the work injury. He placed Mr. Brown at maximum medical improvement and referred him to pain management for possible cervical nerve blocks and medication management.

Pulaski then transferred Mr. Brown's care to physiatrist Kenneth Sykes, M.D. At

the first visit in January 2024, Mr. Brown complained of bilateral neck pain that radiated to both arms as well as numbness and tingling in both arms, the left being worse than the right. Dr. Sykes performed a nerve block at C3-C4 that provided a few hours' relief. He ordered a right-shoulder MRI that showed moderate AC joint degeneration but no rotator cuff tear.

Dr. Sykes then performed an ablation at C3-4, which gave some pain relief. But Mr. Brown continued to experience significant symptoms, so Dr Sykes recommended he undergo a third cervical MRI in June.

According to this MRI report, Mr. Brown suffered from mild to moderate disc bulges with mild to moderate bilateral foraminal stenosis at C3-4, C4-5, and C6-7. Dr. Sykes said he did not have any further treatment options. However, he did note that Mr. Brown had successfully completed a smoking cessation program. On July 15, he placed Mr. Brown at maximum medical improvement with a 4% impairment and said he did not anticipate any further treatment for Mr. Brown's neck.

However, Mr. Brown returned to Dr. Sykes in October with continuing pain that he apportioned as 50% in the neck and 50% in the shoulders and arms. He also complained of constant headaches and numbness and tingling in his left arm. Dr. Sykes took Mr. Brown off work on October 28 and referred him back to Dr. Qamirani.

Dr. Qamirani saw Mr. Brown for the last time in November. Mr. Brown reported 50% neck pain and 50% arm/shoulder pain, mostly in the left arm. He also complained of numbness and weakness in both arms. Dr. Qamirani reviewed the June MRI, and he again differed with the radiologist as to the severity of the stenosis and nerve compression. He repeated his recommendation for a cervical fusion at C3-4 and restricted Mr. Brown from working until he had the surgery.

As before, Pulaski sent the recommendation to Dr. Lager for utilization review. Dr. Lager quoted extensively from the 2023 denial, again observing that Dr. Qamirani's opinion that the April 2023 MRI showed severe foraminal stenosis was inconsistent with the "official" MRI reading by the radiologist. He did not mention the October 2023 MRI or Dr. Sykes's records but did list them as records he reviewed. He referred to the June 2024 MRI record but said that it only revealed mild bilateral stenosis, facet arthropathy, and a "shallow left paracentral disc protrusion" at C3-4. He did not see any evidence of neural compression or focal neurologic deficits. Once again he denied the fusion.

Mr. Brown appealed the utilization review denial to Dr. Snyder, who once again agreed, asserting it was not clear that the procedure would alleviate Mr. Brown's symptoms due to a history of headaches and shoulder involvement. He recommended "further diagnostic studies, EMG/NCV and second opinion."

In addition to medical records, Mr. Brown submitted Dr. Qamirani's deposition. He first established that Mr. Brown's injuries and need for a C-4 fusion primarily arose out of his work-related injury. Mr. Brown required surgery because he developed pain in his left arm and shoulder, and conservative treatment did not relieve his symptoms. He would not reach maximum medical improvement until after surgery.

As for the utilization review reports, Dr. Qamirani expressed concern that Dr. Lager found significance in the fact that there were no neurological deficits at C4. He believed this statement showed that Dr. Lager apparently did not know that the C4 nerve is a sensory nerve. Thus, compression would only cause pain, not neurological deficits.

On cross-examination, Dr. Qamirani confirmed his opinion that the April 2023 MRI showed a C3-4 bulging disc with "severe right and moderate left foraminal stenosis." He testified that when he reviewed the June 2024 MRI film, he believed that it showed the same level of stenosis he found in the April 2023 MRI, despite the radiologist's report of mild stenosis. Finally, Dr. Qamirani drew attention to the October 2023 MRI, noting that the radiologist found evidence of severe foraminal stenosis at C3-4, which was much more in line with his own findings.

Pulaski offered Dr. Clendenin's deposition for its proof. When he first saw Mr. Brown, he complained of a recent onset of left-arm pain, so Dr. Clendenin ordered a cervical MRI. It was performed in October 2023 and revealed many degenerative arthritic changes with severe right foraminal narrowing causing impingement of the C4 nerve root. However, he did not see any acute changes from the first MRI to account for the onset of left-arm symptoms.

Dr. Clendenin said that he did not see any acute radiculopathy, and Mr. Brown's pain was widespread and "way out of the distribution of the C4." Surgery was not an option because the MRI only revealed degenerative and osteoarthritic changes with no acute disc herniations and did not correlate Mr. Brown's symptoms with the MRI findings.

Dr. Clendenin testified that after he performed unsuccessful nerve blocks, he felt he had exhausted treatment options and released Mr. Brown in November 2023. He admitted to not reviewing any records of Mr. Brown's later treatment, but he was not optimistic that surgery would relieve Mr. Brown's symptoms.

On the issue of temporary disability benefits, Mr. Brown's affidavit stated that his last payment for temporary disability benefits was on July 15, 2024. He was seeking benefits from July 16, 2024, to the present and has not worked during this period because of his work injury.

4

**Findings of Fact and Conclusions of Law**

To obtain his requested benefits, Mr. Brown must show a likelihood of prevailing at a hearing on the merits that he is entitled to cervical fusion surgery and additional temporary disability benefits. Tenn. Code Ann. § 50-6-239(d)(1) (2024).

To establish entitlement, Mr. Brown must show he is likely to prove: (1) a work-related injury; (2) that surgery is reasonable and necessary for treating his injury; and (3) he has yet to reach maximum medical improvement and has been unable to work since he last received temporary disability benefits. The Court will address each issue in turn.

To prove a work-related injury, Mr. Brown must show that he sustained an injury arising primarily arose out of and in the course of employment. § 50-6-102(14)(A). Dr. Qamirani, the authorized physician, testified to a reasonable degree of medical certainty that Mr. Brown's current symptoms of neck pain with radiation into both shoulders and arms primarily arose out of this accident. This opinion is presumed correct. § 50-6-102(14)(E). Pulaski did not submit contrary medical evidence, so the Court holds that Mr. Brown is likely to prove at a hearing that his cervical injury arose primarily in the course and scope of his employment.

The more complex issue is whether Dr. Qamirani's recommendation for a cervical fusion is reasonable and necessary to treat Mr. Brown's current symptoms.

The Appeals Board has held that "the utilization review system is intended to ensure the availability of quality medical care services for injured and disabled employees and to manage medical costs in workers' compensation matters." *Gentry v. Arapazuma, Inc.,* 2022 TN Wrk. Comp. App. Bd. LEXIS 30, at *12 (July 19, 2022). The burden of production is on an employer who chooses to challenge treatment prescribed by an authorized physician. *Id.* at *14. A trial court "is not bound by the determination of the utilization review physician or the Bureau's Medical Director but is charged with conducting a de novo review to determine whether Employer rebutted the presumption that the prescribed treatment is reasonably necessary to treat the work injury." *Id.*

On this issue, the medical evidence materially differs. When confronted with conflicting opinions, the Court has discretion to determine which opinion to accept. *Patterson v. Huff & Puff Trucking,* 2018 TN Wrk. Comp. App. Bd. LEXIS 33, at *9 (July 6, 2018). The Court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Orman v. Williams Sonoma, Inc.,* 803 S.W.2d 672, 676 (Tenn. 1991).

Here, Dr. Qamirani is a board-certified orthopedic spine surgeon with years of experience. Dr. Clendenin is a board-certified physical medicine and rehabilitation

specialist. According to the utilization review report, Dr. Lager is a board-certified orthopedist. Drs. Snyder and Talmage are both board-certified orthopedists as well. While all the doctors are qualified to address cervical spine issues, the Court finds that Dr. Qamirani, as a spine surgeon, is more qualified to address the reasonableness and necessity of a cervical fusion than the other physicians.

As to the circumstances of their examinations, Dr. Qamirani is Mr. Brown's authorized treating physician, which entitles his opinion as to the reasonableness and necessity of recommended treatment to a presumption of correctness. § 50-6-204(H). He personally evaluated Mr. Brown several times, which allowed him to assess Mr. Brown's credibility and his response to various modes of treatment. He was also the last doctor to treat Mr. Brown. "It seems reasonable that the physicians having greater contact with the Plaintiff would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one." *Id.* at 677.

Dr. Clendenin saw Mr. Brown twice before releasing him and assigning maximum medical improvement. He did not see Mr. Brown after he discharged him in 2023 and knew nothing of his later treatment. The other doctors who addressed the surgery issue only performed record reviews. Under the circumstances, the Court finds that Dr. Qamirani's history with Mr. Brown gives more weight to his opinion.

Finally, the Court considers the information available to each doctor and the weight given to this information. For this factor, the multiple cervical MRIs and the doctors' interpretations of them become significant. Dr. Qamirani disagreed with the radiologist's reports for the April 2023 and the November 2024 MRIs, concluding the film showed severe foraminal stenosis rather than the mild stenosis the radiologist reported. He also pointed out that the October 2023 MRI report supported his opinion. Dr. Qamirani is the only doctor who documented reviewing the actual film.

Dr. Lager relied on the difference between Dr. Qamirani's and the radiologist's opinions of the severity of the foraminal stenosis in denying surgery. He also described the 2024 MRI as only showing mild stenosis when the report described it as mild to moderate. More significantly, he did not mention the October 2023 MRI report or Dr. Sykes's records for the second utilization review denial except to list them as documents he reviewed. Finally, Dr. Qamirani noted his concern that it did not appear Dr. Lager was aware that the nerve at C3-4 was a sensory nerve and compression would cause only pain with no neurological deficits. Pulaski did not produce any contrary evidence.

As for the medical directors' decisions upholding the utilization review denials, neither doctor offered justification for the denials.

For Dr. Clendenin's part, he acknowledged that the October 2023 MRI showed severe foraminal stenosis at C3-4, which compressed the nerve root on the right. This is

6

consistent with Dr. Qamirani's assessment.

Dr. Clendenin also agreed that Mr. Brown complained of left-shoulder/arm pain when he saw him, although he gave a different weight to this fact than Dr. Qamirani. He believed the left-sided symptoms weighed against surgery, since Mr. Brown did not mention pain immediately after the accident. Dr. Qamirani felt the opposite, citing the fact that Mr. Brown complained of pain that was 50% in his left shoulder/arm and 50% in the neck at his 2024 visit.

After considering the above, the Court finds that the information considered by the doctors and the weight they gave to it also favors Dr. Qamirani's opinion.

Another significant factor is that no doctor has presented any other non-surgical options to relieve Mr. Brown's complaints. He has undergone multiple courses of conservative treatment with no significant improvement. Likewise, no doctor has said that Mr. Brown was not credible or that his symptoms were not real. The fact that Dr. Qamirani is offering a possible solution must weigh in favor of surgery. The Appeals Board upheld a trial court order to authorize surgery, where the medical experts disagreed on its reasonable necessity, but they offered "no countervailing recommendations for reasonable and necessary medical treatment." *Burns-Herrera v. State Indus., LLC,* 2022 TN Wrk. Comp. App. Bd. LEXIS 37, at *17 (Sept. 12, 2022). The Court finds that the information considered by the doctors and the weight they gave to it also favors Dr. Qamirani.

After weighing all the evidence, the Court finds that Pulaski failed to overcome the presumption given to Dr. Qamirani's opinion. Mr. Brown has proven he is likely to prevail at a hearing on the merits regarding entitlement to surgery, and Pulaski must authorize the recommended fusion at C3-4.

As to temporary total disability benefits, Mr. Brown must show the duration of his work-related inability to work. *See Shepherd v. Haren Const. Co., Inc.,* 2016 TN Wrk. Comp. App. Bd. LEXIS 15, at *13 (Mar. 30, 2016). Mr. Brown requested benefits from July 16, 2024, through the present. He stated he has not worked since that time, and Pulaski did not dispute that assertion. However, Dr. Sykes placed Mr. Brown at maximum medical improvement on July 15, 2024, and did not take him off work again until October 28, when he referred him back to Dr. Qamirani.

Dr. Qamirani then took Mr. Brown off work on November 11, 2024, until he undergoes the recommended surgery. He testified that Mr. Brown would not be at maximum medical improvement until he had the surgery. However, he did not dispute that Mr. Brown was at maximum medical improvement on July 15, 2024, and Dr. Sykes never rescinded that opinion. Thus, Mr. Brown has not met his burden of proving temporary total disability from July 16, 2024, through October 27, 2024.

However, given that the Court has determined that the surgery is reasonable and necessary, it follows that, based on Dr. Qamirani's testimony, Mr. Brown is also likely to prove that he has been temporarily totally disabled from at least October 28, 2024, through the present and will remain so until he undergoes surgery. Thus, he is likely to prevail at a hearing on the merits regarding this request. The Court holds that Mr. Brown is entitled to temporary total disability benefits at the compensation rate of $919.07 from October 28, 2024, forward.

IT IS, THEREFORE, ORDERED that:

1. Pulaski shall authorize and pay for Dr. Qamirani to perform the recommended fusions at C3-4.

2. Pulaski shall pay Mr. Brown past temporary total disability benefits of $36,237.62. Mr. Brown's attorney is entitled to 20% attorney's fees, or $7,247.52. Pulaski shall continue to pay Mr. Brown temporary total disability benefits at the rate of $919.07 until he reaches maximum medical improvement or is able to return to work.

3. This case is set for a Scheduling Hearing on **September 22, 2025**, at **10:00 a.m. Central Time**. The parties must call 615-253-0010 or 855-689-9049 to participate. Failure to call might result in a determination of the issues without the party's participation.

4. Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur by seven business days of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3).

**ENTERED August 4, 2025.**

_____
**ROBERT DURHAM, JUDGE**
**Court of Workers' Compensation Claims**

**APPENDIX**

Exhibits:
1. Medical records filed by Pulaski
2. Medical records filed by Mr. Brown
3. Mr. Brown's affidavit
4. Utilization review reports and medical directors' letters affirming denials
5. Dr. Qamirani's deposition with attachments
6. Dr. Clendenin's deposition with attachments

**CERTIFICATE OF SERVICE**

I certify that a copy of the Order was sent as indicated on August 4, 2025.

| Name | Via Email | Service sent to: |
|---|---|---|
| Peter Frech, | X | pfrech@forthepeople.com |
| Larry Cash, Dedie Curtis | X | Larry.Cash@millermartin.com Dedie.Curtis@millermartin.com |

_____
**PENNY SHRUM, Court Clerk**
**WC.CourtClerk@tn.gov**

9



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
    ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
    ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.
    When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk. The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted. For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

    **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable. See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

### Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*